Per Curiam.
 

 The facts to be collected from the bill, answer, depositions, and other evidence, are these : —
 

 The State of North Carolina granted a tract of land, of which the lands in question are part, to Robert Carr, 1st November, 1786. He conveyed to Goodwin, 4th of May, 1789. He conveyed to Beard part of these lands, to the amount of 250 acres ; to Vance 249J acres, 5th April, 1795. Vance sold to Stinson, the elder, in 1797, or in the beginning of 1798, and gave him a bond for title as the defendants state, but as the witness, Beard, states, and as Vance also states, by deed .executed and witnessed by Carmick. Hynes also says, that Stinson, afterwards, on the 8th of August, 1798, gave up the deed to himself; and Vance, by his directions, made another deed of these lands to the other Stinsons who are defendants to this bill, which was registered the 25th of * December, 1798. The witnesses state that Stinson, at the time of this conveyance to his children, was indebted more than he was worth,
 
 *2
 
 and also when he executed this deed, he said now he had done what he had some time wished, for he could not hold the lands himself long, but he hoped he had got it so fixed that his children could enjoy them after him. Records showed divers recoveries against him in the year 1798, and before and after. The evidence shows he was in insolvent circumstances. In 1795 he became surety for Isaac Collit for the costs of a suit prosecuted by Collit against Erwin in ejectment; in which Collit was nonsuited in April, 1796. A
 
 sci. fa.
 
 issued against him in October, 1798. Judgment was given against him in March term, 1799, by confession. A
 
 fi. fa.
 
 issued in September, 1799, which was returned,
 
 levied on three cows and one yearling;
 
 sold for eight dollars. An
 
 alias fi. fa.
 
 reciting it, issued in March term, 1800, and was returned to September term, 1800,
 
 levied on a tract of land of James Stinson,
 
 and to be sold on -the 28th of October. A
 
 venditioni exponas
 
 issued September, 1800, returnable 1801, and was returned
 
 levied on a house and tract of land adjoining Grreeneville, and not sold for the want of bidders.
 
 An
 
 alias venditioni exponas
 
 issued March, 1801, returned
 
 satisfied and money ready to be returned into the office.
 
 Stinson left the house in question and Russell took possession; the young Stinsons sued Russell in ejectment and recovered; and Russell filed this bill 12th of September, 1809. Stinson continued in possession after the date of the deed to his children and from the time he purchased in 1798 to the time of the sale under the execution; he sold two acres, part of this land, to Holt, 1st February, 1799; and to Duncan and Duffield one and a half acres 31st August, 1798, and offered to sell 100 acres, part of the residue, and he and the person he offered to sell to, agreed on the price, but when it was discovered that he had conveyed to his children, * Holt, the intended purchaser, declined proceeding.
 

 On the day of sale the bidding was opened and the land was cried by the deputy, the principal sheriff being present; but on Stinson’s insisting on the sheriff to go with him to get the money of Balch, the sale was suspended, and the sheriff went with him, but not procuring the money, the sale was continued, and was ended after dark. The bidding commenced early in the afternoon. Balch was prevailed upon by Stinson to bid, and asked the sheriff before he began to bid, if he would receive Stinson’s receipt for all the money above
 
 *3
 
 what would satisfy the execution, and was answered yes, but after he had bid as far as two hundred and nine dollars, the sheriff told Balch that he must retract his promise as to the surplus, and that Balch must pay all the money, if it should be even to the amount of two thousand dollars. Whereupon Balch declined, but would have bid any sum needful to accomplish the purchase if he could have been permitted to pay the surplus by Stinson’s receipt. Not long before the conveyance to the children, Stinson advised with Perry, and wanted to know whether he could not, as he was so much embarrassed with debts, convey to his children, so as to secure the property to them. Being answered no, for that it would be considered fraudulent, he replied, he would try it anyhow. The children were all under age when the conveyance was made to them; the eldest not being more.than sixteen years of age. In July, 1798, Stinson conveyed a tract of land called Young’s place, about three miles from the lands in question, to William Wilson, for money advanced to pay off executions levied on the same at the instance of Deaderick ; and also at the instance of King and Dixon. That deed is yet in the possession of Wilson, and is endorsed thus, “
 
 This deed to he in the office till called for hy
 
 me,
 
 W. Wilson.”
 

 Upon these facts, divers main questions have been made at the bar, and divers subordinate and previous ones have arisen.
 

 * First, had Stinson any legal estate in the premises after the deed made to him by Vance, and before and at the time of the deed made to his children ? The answer is furnished by the act of 1715, ch. 38, § 5. The decisions in North Carolina uniformly, and those in this State latterly, have been that no legal estate does pass until registration actually takes place. The construction upon this section, with respect to all deeds, is the same as upon the statute 27th Henry VIII. ch. 16, directing the registration of deeds of' bargain and sale. The estate is to pass by deed executed, and proved, and registered. The latter requisite is equally essential as any of the former. The estate by both acts does not pass till it be complied with. The reason of directing registration is not only for the benefit of creditors and subsequent purchasers, but tq supply the place of livery of seisin, the object of which is notoriety, that the lord might know on whom to call for his services; and the plaintiff in actions for the freehold, then in use, to know against whom, as the tenant, such actions were to be commenced. The act
 
 *4
 
 of 1784, ch. 10, § 7, directing bills of sales for slaves, and the registration thereof, is solely for the benefit of creditors and subsequent purchasers. The title vests immediately, and becomes subsequently void if not registered. But the term,
 
 void
 
 here means at the instance of creditors and subsequent purchasers. This act proceeds upon the same principles as that in 1777, which directs
 
 grants
 
 to issue and to be recorded in twelve months, or to be void. This is for the benefit of the State, is good as to all others, and can only be avoided by the State taking the necessary legal steps for the avoidance.
 

 The second question is, if no legal estate passed to James Stinson, then had he any estate liable to the satisfaction of creditors? for if he had not, then it was no injury to them to have caused it to be conveyed to his children.
 

 * Answer : he had by the payment of the purchase money and the purchase of the lands an use or trust.
 
 2
 
 Bl. Com. 338. The bargain and payment of the purchase money first vests the use, and the statute of uses, the possession. But no right to the possession passes till registration. Before registration and after the payment of the purchase money, the use or trust arises, and vests in the purchaser. It is then immaterial whether Stinson had a deed unregistered, or only a bond for title, for in either case he had the
 
 use.
 
 It is needless therefore to decide whether the execution of the deed to him ought to have been proved by Carmick, and the other subscribing witnesses, or by any of them; for the bond is admitted in the answer. Then, is this use or trust which he had, liable to execution ? A trust estate is liable to execution by statute of 29th Charles II. ch. 3, § 10 ;
 
 vide 2
 
 Saund. 11. “It shall be lawful for any sheriff or other officer, to whom any writ or precept is directed at the suit of any person, if for and upon any judgment, statute, or recognizance, to do, make, and deliver execution unto the party in that behalf suing, of all such lands, tenements, rectories, tithes, rents, and hereditaments, as any other person or persons are in any manner of wise seized or possessed in trust for him against whom execution is so sued, like as the sheriff or other officer might, 'or ought to have done, if the said party against whom execution was sued had been seized of such lands, &c., of such estate, as they are seized of in
 
 trust,
 
 for him at the time of the said execution sued, which land, &c., by virtue and force of such ex
 
 *5
 
 ecution, shall accordingly be held and enjoyed free, and discharged from all incumbrances of such person or persons as shall be seized or possessed in trust for the person against whom such execution shall be sued, and if any
 
 cestui que trust
 
 shall die, leaving a trust in fee simple to descend to his heir, then, and in every such case, such trust shall be deemed and taken, and is hereby declared to be assets by descent, and the heir shall be liable to * and chargeable with the obligation of his ancestor, for and by reason of such assets, as fully and amply as he might or ought to have been, if the estate in law had descended to him in possession, in like manner as the trust descended.”
 

 If this section of the act of Charles II. be in force in this State, a trust estate is liable to execution. And if Stinson had the use or trust continuing in him on the day when the first
 
 fi. fa.
 
 issued against him, in September, 1799, that'trust was liable. By this act the trust is bound, not by the judgment as other real estates are by the statute of Westminster the 2d, ch. 38, which introduced the elegit, but only by the issuing of
 
 the fi. fa.
 
 and from the date of the teste thereof. Had Stinson this trust on the day when the j/2.
 
 fa.
 
 issued against him in September, 1799? He caused the lands in question to be conveyed to his children on the 8th of August, 1798. This conveyance, however, "was made to defraud creditors; it was made when he was indebted, and insolvent. The
 
 sci. fa.
 
 issued October, 1798, and judgment was entered September, 1799. It was made to his children without valuable consideration paid by them; he continued in possession, and sold parts of the same land to Holt and Duncan and Duffield, and it was made for the express purpose of defeating creditors. These circumstances are proof sufficient of the fraud intended; the fraud in this instance would be accomplished, if the conveyance to the children were deemed valid. It does not appear that he had any other property upon which the execution could have been levied. Being fraudulent it was void as to creditors, both by the common law, by the statute of 13th Elizabeth, ch. 5, arid by our act of 1715, ch. 33, § 8. It is an alienation of lands to which in equity he is entitled, as much as he is entitled at law, by a conveyance made as required by the same act, § 5. Indeed, the common law would produce the same effect as these acts do, had they never been made. * They are not additional to, but declarative of the common law, which
 
 *6
 
 extends to all the cases mentioned in these acts, and to all other cases not mentioned in them, -which if not invalidated would produce the loss of a just debt to a creditor, by fraudulent alienation of property liable to the satisfaction of his debt. This deed to the children being void as to creditors, is void as to the creditor in this
 
 fi. fa.,
 
 and of course, as between him and Stinson, the property continued in Stinson oh the day when the
 
 fi. fa.
 
 issued.
 

 The question then comes forward, is such a trust liable to
 
 fi. fa.
 
 by our law, as it was by the law of England liable to execution in consequence of the 29th Charles II. ch. 3, § 10 ? That section, as well as the act of 3d and 4th William and Mary, ch. 14, reenacted by North Carolina, 1798, ch. 39, § 2, though both of them passed after the 4th of dames I., are in force here as the court conceives ; though not within the general rule for determining what statutes in England are in force in this country. The act 5th George II. ch. 7, is in these words, § 4: “ And be it further enacted, by the authority aforesaid, that from and after the said 29th day of September, 1732, the houses, lands, negroes, and other hereditaments and real estates, situate or being within any of the said plantations belonging to any person indebted, shall be liable to, and chargeable with all just debts, duties, and demands of what nature or kind soever, owing by any such person to his Majesty, or any of his subjects, and shall and may be assets, for the satisfaction thereof, in like manner as real estates are by the law of England liable to the satisfaction of debts, due by bond or other specialty, and shall be subject to the like remedies, proceedings, and process in any court of law or equity, in any of the said plantations respectively, for seizing, extending, selling, or disposing of any such houses, lands, negroes,- and other hereditaments and real estates towards the satisfaction of such debts, duties, and demands, and in like * manner as personal estates in any of the said plantations respectively are seized, extended, sold, or disposed of for the satisfaction of debts.”
 

 This act speaks, first, of the liability of lands in America, and, secondly, of the judicial process to be used against them, for the effectuation of that liability. Lands, &c., and real estates are made liable, &c., as real estates are in England ; how is that ? A trust estate in England was then a real estate, descendible, devisable, alienable, and extendible for the satisfaction of debts. Lands de
 
 *7
 
 vised were then liable in England in the hands of the devisee by the 3d and 4th of William and Mary, ch. 14, though by the common law none but lands descended were. Immediately upon the passage of this act of George II., all statutes for the subjection of real estates to the satisfaction of debts, as well as the common law upon the subject, which these statutes had amended or added to, were in force in the colonies. Is it to be believed that lands devised away from the heir were not liable to be sold for debts, from 1732 to 1789, a space of fifty-seven years, till the act of the 3d and 4th of William and Mary, ch. 14, was reenacted by the Assembly of North Carolina, 1789, ch. 36, § 2? In all this time there is no instance within our knowledge of a debt lost by such devise. Had such been the law, it would have been altered and provided for, long before the year 1789. In consequence of this act of George II., lands and tenements were inserted in the
 
 fi.fa.,
 
 which by the common law only issued against goods and chattels. These words were added for the purpose of reaching the real estate made liable by the act of George, including trusts of freehold estates made liable by the laws of England then existing, amongst which was this section of 29th Charles II. ch. 8, § 10. Such was the form and effect of the
 
 fi. fa.
 
 as altered by the act of George II. when the act of 1777, ch. 2, § 29, was enacted. It continued the
 
 fi. fa.
 
 against lands as it had been established by the * act of George II., not at all impairing its form or extent, but rather enlarging it; for executions which before issued only against goods and chattels,.were then directed to issue against lands and tenements, also-; which perhaps was meant for executions issued by justices of the peace; which in 1786, ch. 14, § 10, are understood to extend to real estate by virtue of the words “ lands and tenements,” which, by the act of -1777, are directed to be inserted in them, overlooks the clause in the same act which directs execution from justices of the peace to issue against the goods and chattels, or body of the. deb tor. What is
 
 real
 
 estate, one of the terms used in the act .of George II. ? All the lands, tenements, and trusts which a man hath; for by these words,
 
 real
 
 estate, lands subject to trusts for the benefit of the devisor will pass to his devisee. The act of George II. ■ is also enforced by the act 1778, ch. 5, and with it all the statutes that are referred to by it as forming the law of England upon this subject when it
 
 passed;
 
 of course this section of 29th of
 
 *8
 
 Charles II. ch. 3, § 10, was enforced at the same time. These acts are all enforced, furthermore, by the Constitution of this State, and by the act of 1789, ch. 3, § 8. The 10th article of the Constitution, § 2, continues in force the same statutes and acts of Assembly as the State received from North Carolina. The result is, that the act of Charles II. is enforced by the latter provisions, and that
 
 trust
 
 estates are liable here, as spoken of in the case citeS at the bar, 8 E. 486. From all these considerations the conclusion follows, that although it be true, in general, that equitable estates are not liable to
 
 fi. fa.
 
 because not known to the common, law, yet an equitable estate, being also a
 
 trust
 
 dependent on a legal estate of freehold, is subject to this statutory provision.
 

 And this is the reason why the Legislature of this State and of North Carolina have not made any law relative to this subject, as they would most certainly have done long ago had it been understood to be law, * that a debtor might defeat all his creditors by purchasing and paying for land, and thereby raising a trust, which no creditor could affect, ©r by getting a deed and keeping it from registration. A debtor would then have nothing to do but turn all his estate into a trust or deed unregistered, and bid defiance to all his creditors.
 

 Objections are made by Stinson’s counsel, which have been considred, and deserve to be answered. The first is, that this land was sold by an
 
 alias venditioni
 
 exponas, without any seizure upon the second
 
 fi.
 
 fa., the same not being produced. Answer: we must consider the mode of transacting business in this country formerly, and conform to it, s in case of a verdict from North Carolina without any judgment, or a scroll for a seal. The practice has been to write
 
 alias
 
 on the second
 
 fi. fa.,
 
 and to put that into the hands of the sheriff, as a new writ. In such case, if the seizure be made on the second, the clerk can only state in his record the return to it, and that is done here. It is recited in the first
 
 venditioni exponas.
 
 We do not say that a
 
 fi. fa.
 
 is not necessary to be produced; but we believe that what is shown ought to be received on this occasion as equivalent to a
 
 fi. fa.
 
 And here let us notice a difference between the sale of chattels and of lands; the former must be actually seized and shown to the bidder on the day of sale. Not so of the latter; for they are incapable of seizure and removal to the place of sale. A remainder or reversion may be sold, as well as a present possession, and these
 
 *9
 
 cannot be seized; therefore the sheriff need not enter upon them, nor make any actual seizure; he may return the lands which he has selected for advertisement and sale, and may sell them afterwards. If is true a seizure of personalty or a selection of realty, to the value of the debt, is a discharge of the debtor, and an exemption of his other property, unless the property seized be destroyed, without default of the sheriff.
 

 * But what is the proof here ? That another tract was selected ? Not so. A tract of land generally stated in the return, but not described to be a different tract from this. The sale of this tract of land is consistent with the return, and probably with the fact. Young’s place was attached for Deaderick’s debt; and King and Dixon’s debt in July, 1798, or before. It is true a
 
 venditioni exponas
 
 gives no authority to the sheriff to sell; his power is derived from the
 
 fi. fa.,
 
 and having once seized or selected, and becoming thereby the debtor, he must sell and raise the money, whether the
 
 venditioni exponas
 
 issue or not. ' When it issues, it is only to quicken the sheriff’s proceeding, not to communicate any new authority. These remarks, however, need not be made as this case is circumstanced.
 

 Another objection is, that this sale was made after sunset. Answer : that was at the instance of the defendant in the execution, and therefore cannot be argued by him as a fraud detrimental to his rights. The act of Assembly upon this subject was made for the benefit of defendants, and its provisions may be dispensed with to suit their convenience, if requested by them ; and besides, not within the act of 1807, which was passed long after the sale.
 

 Another objection is, that Russell has tried his cause at law, and ought to be bound by the judgment there given as he submitted to a trial there. Answer : in the case of an ejectment he may try his cause again at law, and why not also in equity, as well as law, where his case is originally equitable ? Where the judgment is final at law, perhaps it would be a bar in equity if pleaded in bar ; unless circumstances attended the trial at law, which required the aid of equity. *
 

 Another objection is, that Stinson "was not a debtor till the judgment against him in March, 1799 ; until that time it could not be known that he would ever be liable. Answer: if he became subsequently indebted, and contemplated the same at the * time of the conveyance to his children, he is within the law
 
 *10
 
 against fraudulent conveyances. Moreover, we believe a co-obligor who is only a surety, is as much prohibited by these laws from making a fraudulent conveyance to defeat, creditors, as if he were the principal obligor; for the creditor, perhaps, would not have trusted the principal had it not been for the supposed sufficiency of the surety.
 

 Another objection is that this court will not execute a contract concerning the realty, unless it be reasonable and just, and here the price is greatly inadequate to the value. Answer : that is true as to contracts between individuals, for the sale and purchase of lands, for there it is in the discretion of the court to interfere or not. Here is not such a contract but an execution sale, -which is good both in law and equity. This court ought to enforce and aid the efficacy of a sale made by the law, for otherwise it wquld lose its effect. No one would purchase such an interest if the law could not aid him, and if at the same time equity was at liberty to withdraw its assistance. Inadequacy is the general consequence of execution sales. The loss is imputable to none but the defendant in
 
 thefi.fa.
 

 Objection : if the estate in the children be void, the court cannot transfer the void estate to the plaintiff. Answer: a void estate in general need only be declared void by the rules of a court of equity, and need not be ordered to be transferred. Equity, however, is not bound down by the forms of the court, adopted for convenience, to adhere to a course which will not answer the purposes of substantial justice, but may, in all needful cases, adapt their directions to the matter before them. The court may direct all parties before them..to join in conveyances or release; who, if they should not join, might hang a cloud over the title of him for whom they decree.
 

 It is again objected, that the sheriff agreed to take * the surplus in Stinson’s receipt, and afterwards recalled his promise, and, by that means, stopped Balch from bidding. Answer: he acted prudently in recalling it, for he was commanded by his writ to pay it into court. The surplüs belonged either to the children or creditors, and he would have been liable to them for any mispayment or misapplication of it.
 

 It. is objected further, that § 10, of 1715, ch. 38, is restrictive of § 5, and proves therefore that
 
 bona fide
 
 deeds need not be registered as between the parties, and shows, that deeds in the 5th
 
 *11
 
 section are only registered for the benefit of creditors and subsequent purchasers. Answer: §§ 8 and 10 are copied from the 13th Elizabeth, in which is the same exception. It was intended here to answer the same purpose as in that statute, and has no connection with § 5.
 

 Decree the legal estate in the lands in question in this bill, that is to say, that all the lands conveyed to the defendants, the sons of James Stinson, by Samuel Vance, except sucli parts thereof as were sold to Holt or Duncan and Duflield before the sale made by the sheriff to the complainant, be divested Out of all persons, defendants to this bill; and that the complainant from and after this decree shall have and hold the said lands to him, his heirs and assigns forever. That the injunction obtained by the complainant shall be and hereby is made perpetual, and that the defendants, the said James Stinson, senior, and his sons, shall pay the costs of this suit.
 

 See, as to
 
 real estate, Porter
 
 v.
 
 Cocke,
 
 Peck, 30; Code, 3026. As to
 
 trusts, Shute
 
 v.
 
 Harder,
 
 1 Yer. 1;
 
 Shute
 
 v.
 
 Harder, 4
 
 Hay. 293;
 
 Waller
 
 v.
 
 Whitesides, A
 
 Hay. 191;
 
 Vance
 
 v.
 
 McNairy,
 
 3 Yer. 171;
 
 Smitheal
 
 v.
 
 Gray,
 
 1 Hum. 491;
 
 Thomas
 
 v.
 
 Walker,
 
 6 Hum. 93; King’s Digest, 6378, 6380-2, 6385, 6393, 6483, 6599, 8575.