IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
MAY 22, 2007 Session

**IN RE: THE ESTATE OF WILLIAM REYNOLDS, JR., DECEASED**

**RANDAL REYNOLDS, Administrator of the Estate of William Reynolds, Jr.
v. FREDDIE VOLNER, ET AL.**

**Direct Appeal from the Chancery Court for Gibson County (Trenton)
No. 17223P    George R. Ellis, Chancellor**

---

**No. W2006-01076-COA-R3-CV - Filed September 11, 2007**

---

**DISSENT**

---

HOLLY M. KIRBY, J., dissenting.

I must respectfully dissent from the majority opinion in this case.

I believe that the trial court's decision was based on the trial judge's determination of the witnesses' credibility and should be affirmed on the ground of inadequate consideration. The trial judge made a factual finding that the equipment at issue had a value of $79,550, and there has been no appeal of that finding. Even according to Mr. Volner's testimony, he paid no more than $20,000 for all of this equipment, approximately 25% of its value. This inadequacy of consideration does not stand alone; it is accompanied by "inequitable incidents" or "badges of fraud." A "badge of fraud" can be "any fact that throws suspicion on the transaction and calls for an explanation." ***Reagan v. Connelly***, No. E2000-00451-COA-R3-CV, 2000 WL 1661524, at *4 (Tenn. Ct. App. Nov. 6, 2000) (quoting ***Macon Bank & Trust Co. v. Holland***, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986). These include inadequate consideration for the transfer, a family or friendship relationship between the transferor and the transferee, and a lack of explanation for the suspicious transaction. ***Stevenson v. Hicks (In re: Hicks)***, 176 Bankr. 466, 470 (Bankr. W.D. Tenn. 1995). Similarly, "inequitable incidents" indicating fraud include undue advantage, ignorance, sickness, old age, incapacities, and the like. ***Estate of Fischer, ex rel Meyers v. Rogers***, 2002 WL 31895721, at *5 (Tenn. Ct. Appl. Dec. 31, 2002). Where one or more badges of fraud are present, a presumption of fraud arises "and consequently shift the burden of disproving fraud to the defendant." ***Id.*** (quoting ***Stevenson v. Hicks (In re: Hicks)***, 176 Bankr. 466, 470 9Bankr. W.D. Tenn. 1995)). In this case, there are numerous such badges of fraud and inequitable incidents.

In the case at bar, the testimony shows that the sale was to Mr. Reynolds' trusted friend, Mr. Volner. At the time, Mr. Reynolds was old and ill with terminal cancer; the transaction took place eleven days before his death. The Administrator, Mr. Reynolds' son, gave unrefuted testimony that Mr. Reynolds was unable to read or write, and yet the sale was based on a bill of sale drawn up by unknown persons prior to the transaction. The bill of sale recited no sales price, only boiler plate language, "For value received." The virtually illegible signature on the document was purportedly that of Mr. Reynolds, but none of the "witnesses" saw him sign it. Mr. Reynolds' son was shown the signature on the bill of sale and was asked if he recognized his father's signature; he responded, "Well, not really. You can't hardly read it." None of the witnesses testified that the document was read or explained to Mr. Reynolds or that he understood what it said. Witnesses testified only that Mr. Reynolds received an undetermined "wad" of cash on the day in question. Mr. Volner testified that part of the alleged consideration was $10,000, again in cash, that Mr. Volner had purportedly given Mr. Reynolds months earlier for "a loan or on the dozer, either way," again with no documentation.

The testimony of Mr. Reynolds' son and former stepdaughter indicated that Mr. Reynolds' mental condition was severely compromised and that he was heavily medicated with morphine in the month or so before he died, and in the two weeks before he died, he was "oblivious to the world," taking morphine that was crushed or liquified because he "couldn't swallow, couldn't talk." The testimony of Mr. Reynolds' wife, whom he had recently married, was uneven at best.[1] She testified at one point that Mr. Reynolds' was "very sharp;" at another point she said that he was taking "a lot" of medication, in liquid form because he could not swallow. She noted that the hospice nurse "got onto me for not making him take his medicine," and then added that he took, "in the end, yeah a lot." Without specifying any time periods, she said that Mr. Reynolds "didn't take much medicine. Did he in the end? Yeah, absolutely."

Finally, the explanation that Mr. Volner gives for the whole transaction simply does not make sense. Mr. Volner testified that the extremely low sales price for the equipment occurred because Mr. Reynolds pressured him into purchasing all of the equipment for a fraction of its value. When asked why in his deposition, Mr. Volner said, "he wanted me to have it all, and why I don't know. I tried to get him to sell it to his brother, and I told him I didn't want it." Mr. Volner later testified that Mr. Reynolds asked Mr. Volner, who was not a family member of Mr. Reynolds, to take the well drilling equipment and help Mr. Reynolds' wife "stay in the well drilling business," and if not her, then Mr. Reynolds' brother David, adding that Mr. Reynolds "didn't want it out of the family." Yet Mr. Volner declined to turn the equipment over to Mr. Reynolds' family, specifically, to the Administrator of Mr. Reynolds' estate, his son.

Regardless of whether any one of these facts is conclusive, taken together, they are sufficient "badges of fraud" to raise a presumption of fraud and shift the burden of disproving fraud to the

---

[1]The Administrator of the estate, Mr. Reynolds' son, testified, "I wouldn't say I get along with [Mr. Reynolds' widow] because I don't ever see her." He stated that, after his father's death, Mrs. Reynolds and her brother were "busted for a meth lab" at his father's residence.

Volners.  Given the trial judge's implicit findings on credibility, I would find that the Volners did not carry their burden, and affirm the trial court's decision.

Therefore, I respectfully dissent.

_____
HOLLY M. KIRBY, JUDGE